### KOETTER v. MANHATTAN RY. CO.

*(Supreme Court, General Term, First Department. February 11, 1891.)*

1. CARRIERS—INJURY TO PASSENGERS—NEGLIGENCE OF CONDUCTORS.
     In an action against an elevated railway company for injuries to a passenger alleged to have been sustained by the acts of one of its conductors, a charge that

plaintiff cannot recover merely upon the ground of unintentional negligence of a guard, but only on the ground of direct, willful negligence inflicted by the guard, was properly refused, as plaintiff was entitled to recover whether the negligence was direct or willful, or whether the guard had been merely careless in conducting himself and caring for the passengers the safety of whose life and limb was intrusted to the defendant.

2. SAME—DECLARATIONS OF CONDUCTOR.
    Declarations of the conductor at the time of the accident that he was sorry he had "done" it were competent, as tending to explain the nature of the act complained of.

3. SAME—MEASURE OF DAMAGES.
    There being expert testimony that plaintiff's injuries were incurable, and might cause future suffering, it was proper to charge that if the jury found for plaintiff she "is entitled to compensation, if from the testimony you find that there is a reasonable certainty that she may suffer in the future from these injuries."

4. EXCESSIVE DAMAGES—PERSONAL INJURIES.
    The evidence tending to show that plaintiff's injuries were incurable, and that she had been deprived of the power apparently of making a livelihood, and at the time of the trial was still under treatment, and supported by the kindness of friends, a verdict for $10,000 was not excessive.

Appeal from circuit court, New York county.

Action by Lizzie Koetter against the Manhattan Railway Company. There was a verdict for plaintiff for $10,000. From the judgment entered thereon the defendant appeals.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Davies, Cole & Rapallo,* for appellant.    *Howe & Hummel,* for respondent.

BRADY, J. This action was brought to recover damages resulting from the negligence of the defendant. The defense was that the defendant was free from negligence, and that the injuries received by the plaintiff were caused by her own negligence. The account of the accident given by the plaintiff was as follows: "On the 26th day of October, 1886, Miss Shane resided in the same house with me. We started from there to my place of business and to her place of business. We went through Eighty-First street to the Eightieth-Street station. We went through the gate together, Miss Shane and I, and we dropped the ticket, and the train came along, and Miss Shane boarded the train. That was 25 minutes to 8 o'clock in the morning. I was due down town at 8 o'clock. Miss Shane boarded the train. Two or three gentlemen crowded in between Miss Shane and I. I was pushed off by the guard. As I stepped back, waiting to board the next train, the signal was given. The rope was pulled by the guard. I did not hear the bell ring. I only saw him pull the rope. As I stood back waiting to board the next train, my arm was seized by the guard, which is my right arm, and I was dragged the extreme length of the platform. From the force of the push that I received I felt that I was falling, but I don't know where I fell to. Then I went into the waiting-room when I came to myself, and the ticket agent was there, and he told me not to go to business. He told me not to go, but I did go. I could not tell exactly how long I remained. I didn't remain there any time at all. I went direct to my physician, Dr. Vandergriffe. He called some time in the evening, about 5 o'clock. I was then in bed. Up to that time I had always been a healthy girl. Nothing at all the matter with me up to the time of the injury. When I was seized by the arm I was standing on the platform of the station, standing back waiting to board the next train. I think I have stated all that took place. I could not exactly tell you how far I was dragged by the guard. *Question.* One foot or ten feet? *Answer.* I could not tell you. I don't remember; I was so frightened. I remember screaming that I didn't want to board the train. *Q.* Notwithstanding which he kept hold of you all the time? *A.* He seized me. I felt that I was falling, and that is all I remember. Up to that time I suppose the guard still had a hold of me; up to the time I fell. After that I was unconscious. I

was confined to my bed, I think it was seven months from the start. Dr. Vandergriffe treated me for about a month or six weeks, then Dr. Gaedeke, who is still treating me now, was called in. The train had started when the guard had hold of my arm. Besides Dr. Gaedeke, I was examined by Dr. Vandergriffe, Dr. Leale, a specialist for the Manhattan Railway Company, and Dr. Field, from the Manhattan Railway Company, but he only made an external examination. The other physician examined me internally. I am still under treatment. I have not done any work since that time. To my knowledge, I have not done anything,—nothing that amounts to anything." And her testimony is consistent with that of Miss Shane, who was referred to in that statement, and tells the same story. The defendant called several witnesses, including the guard, and by which it insists that the occurrence was proved substantially to be as follows: That the guard saw the plaintiff coming up stairs to the landing after he had given the signal to start; that the plaintiff rushed up after he had closed one gate and was just closing the other; that he told her she was too late, but she persistently tried to get aboard the car; that she then grabbed the stanchion of the car, and he leaned over the gate, and tried to wrest her, and put his arm around her waist to keep her up; that she was walking along the car line, and she finally tripped, and he thought he put her on her feet, and did not push her down, or any way pull her along the platform. The occurrence, therefore, was presented to the jury for their consideration upon conflicting evidence,—indeed, it may be said, as to all things except the presence of the plaintiff and her witnesses. The learned judge in his charge called the attention of the jury to the testimony *pro* and *con*, leaving them to decide the real issue, whether the plaintiff had established the negligence of the defendant, and her own freedom from negligence which in any way contributed to the accident. Several requests, however, to charge were made by the defendant, nearly all of which the court granted; some of which were extremely favorable to it. The jury nevertheless found for the plaintiff a verdict for $10,000.

The first point presented on behalf of the defendant was that the verdict is contrary to the evidence, and the motion for a new trial should have been granted. This is founded on the proposition that the plaintiff's case presents an alleged act of wanton and total negligence on the part of the guard, and that the plaintiff's story was confronted at the outset by an inherent improbability, while the defendant's account is so natural as to almost suggest itself, even in the absence of any testimony. The counsel for the appellant had the opportunity upon the trial to elaborate this view of the case, and no doubt did so, in his address to the jury, and there were elements which might be used with success, but unfortunately for him the jury established by law as the tribunal to dispose of such conflicts found against his client. A perusal of the evidence does not suggest the propriety of interfering with the verdict upon the ground that it is contrary to the evidence. It must be said the evidence sustains it,—sustains the propositions that the defendant was guilty of negligence, and that the plaintiff was guiltless of any contributory negligence on her part.

The next point presented on behalf of the appellant is that the learned justice of the court below refused to charge as follows: "That the plaintiff cannot recover merely upon the ground of unintentional negligence of a guard, but only on the ground of direct, willful negligence inflicted by the guard." The answer to the alleged error of this refusal is given by the respondent's points, and is that the plaintiff was entitled to recover if the defendant, by its agents or servants, was guilty of negligence, whether that negligence was direct and willful, or whether the guard had been merely careless in conducting himself and caring for the passengers the safety of whose life and limb was intrusted to the defendant. It is said in 1 Shear. & R. Neg. § 141, that the liability of defendants in cases of this character is not confined to the mere

negligence of servants, but extends also to their willful acts, though unauthorized or even forbidden by the master, so far as such acts deprive third persons of a benefit which the master was bound to confer upon them, or for any other reason have occurred in the course of the servant's employment. Although the master may, as has been stated, be responsible for some willful wrong committed by his servants, such responsibility, when these acts have not been authorized by the master, may still fall under the law of negligence. The master, if sued on the ground of negligence, may be considered in such case guilty, not of the wrongful act itself, but only of neglect to restrain his servant from committing it; and, further, that the soundness of the principle thus stated, and the necessity of the rule which we have inherited from the Roman law, have received new and convincing illustrations in the development of modern corporations.    There is therefore no value in the second point.

The next error complained of is that the witness Lizzie Shane was allowed to testify that the guard stated after the accident, viz.: "That he was very sorry he had done it." The objection thus urged arose in the following manner: "*Question.* What did the guard say in reference to the train, tf anything?" The counsel for the defendant objected to the question as hearsay and irrelevant. The court overruled the objection. The counsel for the defendant duly excepted. That question, however, was not answered, but was followed by this question, namely, "Did you see the guard here in court yesterday?" To which the answer was, "No, sir; I did not see him." This was followed with the question, "Did you hear the guard say anything then?" to which answer was given in the form of a question, namely: "At the time of the accident? *Question.* Yes. *Answer.* He said he was very sorry he had done it." It will be perceived that there was no objection to the question asked, which was, "Did you hear the guard say anything at the time of the accident?" and which was entirely different from the question previously asked, which was, "What did the guard say in reference to the train, if anything?" This is supposed to be a complete answer to the exception mentioned, for three reasons: (1) As already stated, no objection was made to the question; (2) that it was wholly immaterial whether the guard was sorry he had done it or not,—the liability of the defendant resting upon the fact that the act complained of had been permitted, and that the evidence could not prejudice the defendant in any manner; and (3) that, if this be not so, the declarations of the party in a case like this, made at the time, and calculated to elucidate and explain the character and quality of the act, and so connected with it as to constitute one transaction, and so as to derive credit from the act itself, are admissible in evidence.    *Waldele* v. *Railroad Co.*, 95 N. Y. 274–278.

The next proposition urged on behalf of the appellant is that the learned judge presiding at the trial charged the jury that they could award damages to the plaintiff for future pain and suffering, in the absence of any evidence that she was likely to suffer it in the future. A complete answer to this proposition is that the learned counsel for the appellant is entirely mistaken in supposing that such a charge was made. What the learned judge said was this: "That if they found a verdict in favor of the plaintiff, they should consider the damages which should be allowed to her," and then "she is entitled to compensation, if from the testimony you find that there is a reasonable certainty that she may suffer in the future from these injuries." There was nothing, therefore, said about future pain. The propriety of the charge as to the future suffering arises from the fact that Dr. Gaedeke testified that, "in his estimation, the injuries received by the plaintiff were incurable," which was not contradicted in any way, and it may be presumed could not be, from the fact that two physicians on behalf of the defendant made an examination of the plaintiff, neither of whom was called upon the trial; and the further fact, which the plaintiff had testified to, namely, that she was still under treatment, and had done nothing in the way of work since the accident occurred,

which was on the 26th of October, 1887. Under such circumstances the charge was strictly within the rule declared in *Feeney* v. *Railroad Co.*, 116 N. Y. 382, 22 N. E. Rep. 402, in which the court said: "It may now be regarded as settled that the jury, in cases of this character, may take into account the pain and suffering which may reasonably be expected in the future, provided evidence has been given tending to show that the person injured will probably experience future pain as a result of the injury." The testimony of Dr. Gaedeke, which is as follows, after his statement of his examination of the plaintiff: "*Question.* What did you find? *Answer.* I had heard previously that there had been an accident. I cannot make a diagnosis without a history of the case. *Q.* What did you find? *A.* I found a blood tumor in the abdomen,—a so-called 'hematocle.' *Q.* That is called a 'hematoma?' *A.* Yes, sir; that is right. I also found the pelvic cellular tissue—which is a fatty cellular substance in the pelvis, which surrounds the pelvic organs— was highly inflamed,on the right side. That could have been brought about by a recent injury. I think it could by a violent fall. Between the *uterus* and the rectum I found this hematocle,—the blood tumor. The *uterus* was very sensitive and painful, according to the patient's statement of the case. The cellular tissue was infiltrated by the process of inflammation. It was enlarged and inflamed. A violent shock or injury, such as being thrown down, would bring that out. At that time I did not notice any fracture of anything about them. I noticed, I think about a month after that, a fracture of the so-called 'coccyx,' the last bone of the spine. *Q.* When did you find that that had been fractured? *A.* I think about a month after that I noticed that. During the time that I was examining her and treating her Dr. Leale called. I don't know whether he is the physician for the elevated railway company. I visited Miss Koetter on very frequent occasions, and treated her for the injury that she had at that time, and that she had not had before. At the time that I found the fracture of the lower bone of the spine in the condition that I have described, I made a diagnosis of her case. The injuries, in my estimation, are incurable,"—contains evidence tending to show that the plaintiff's injuries would probably subject her to future suffering, as a result of the injury. This exception to the charge, therefore, cannot be sustained.

It is next urged that the verdict is excessive, and the result of the passion or prejudice of the jury, and one of the reasons assigned as establishing the justice of the criticism is that the whole of the plaintiff's case is contained in eight printed pages of the testimony. It is true that that is not the only reason assigned, but it is illustrative of the disposition to treat the plaintiff's case as one of little importance, notwithstanding that the uncontradicted medical evidence shows that her injuries are incurable, and that she has been deprived of the power, apparently, of making a livelihood, and from the time of the accident in 1887, at least down to the time of the trial, was still under treatment, and also that from that time to the time of the trial she had been supported by the kindness of one friend or more. Under such circumstances, $10,000, substantially paid for a ruined life, does not seem to be excessive. If well invested, it would not produce more than $500 a year, although that sum would not be left after the payment of the expenses to which her injuries subjected her, and the payment also of counsel fees for the prosecution of this action, whatever they may be. Whatever may be said on the part of the defendant as to the inherent improbability of the plaintiff's story, it must not be forgotten that as to the accident the plaintiff was sustained by the testimony of her companion at the time it occurred, and that the jury, after a charge embracing all the necessary elements, decided that the plaintiff's statement was a correct account of the occurrence; and it must be further said that, under all the circumstances disclosed by the record, the plaintiff's injury and its results, properly considered, suggest that such a verdict as was rendered might well be given without passion and without prejudice. If, however, we

resort to authorities, it will be found that "the general rule is that the jury are the exclusive judges of the amount of damages, except in those cases where they follow, as a matter of law, from facts proved, and the result of a mere computation. In all cases for injuries to the person, to family rights, or to the reputation, the jury are allowed to give what is sometimes termed a 'round sum.' The law prefers the judgment of twelve men in the jury-box to the judgment of one man on the judicial bench. It is therefore the settled rule, enforced by many decisions, though couched in various forms of expression, that in cases of this character a new trial will not be granted, unless the damages are such as strike every one with the enormity and injustice of them, and such as would induce the court to believe that the jury must have acted from prejudice, partiality, or corruption." See 2 Thomp. Trials, § 2067, and numerous cases cited. It was said by Bockes, J., (8 Hun, p. 289:) "The subject of damages is for the jury, and must be at all times in their discretion and judgment. The court can only interfere on this point when it is apparent that the jury were improperly influenced, or must have acted from passion, prejudice, partiality, or corruption. The authority to grant new trials on the ground of excessive damages is undoubted, but its exercise by the courts has been thought equally capricious as has been the verdict of juries. Little aid can be obtained on this subject by referring to the cases, as will be seen by turning to the opinion of Mr. Justice Hogeboom, in the case of *Murray* v. *Railroad Co.*, 47 Barb. 196." And in *Walker* v. *Railroad Co.*, 63 Barb. 267, it was said by Mr. Justice Daniels: "The law has committed the determination of the amount of damages to be awarded to the experience and good sense of the jury, and, where the verdict rendered by them may reasonably be presumed to have resulted from an honest and intelligent exercise of judgment upon their part, the policy of the court is, and necessarily must be, not to interfere with their conclusion." The judgment should be affirmed, with costs.

All concur.